## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JOSEPH COE <u>et al.</u>                  :
                                          :
v.                                        :   Civil No. WMN-08-1323
                                          :
THE CITY OF BALTIMORE <u>et al.</u>       :


### <u>MEMORANDUM</u>

Before the Court are motions for summary judgment filed by Defendant Mayor and City Council of Baltimore (the City), Paper No. 25, and by Defendant Leonard Hamm, Paper No. 26.  Both motions are ripe for review.  Upon review of the pleadings and the applicable case law, the Court determines that no hearing is necessary (Local Rule 105.6) and that both motions will be granted.

### I. FACTUAL AND PROCEDURAL BACKGROUND

This action arises out of the shooting death of Lornell Wilkins on April 1, 2005.  Mr. Wilkins was shot by several officers of the Baltimore City Police Department (BPD) after an extended car chase. Plaintiffs are Mr. Joseph Coe, as personal representative of Mr. Wilkins' estate, and Rachel Coe, Mr. Wilkins' mother, on her own behalf.  Plaintiffs filed suit in the Circuit City for Baltimore City on or about March 26, 2008.  In addition to the City, Plaintiffs also named as a Defendant Leonard Hamm, the Police Commissioner for Baltimore City at the time of the shooting.

The Complaint contained seven counts.  In Count I, brought

against the City and pursuant to 42 U.S.C. § 1983, Plaintiffs asserted that the police officers used excessive force against Mr. Wilkins and that the City "approved and/or conducted the intentional acts" of Defendant Hamm and the officers.  In Count II, also brought against the City under § 1983, Plaintiffs asserted that the deprivation of Mr. Wilkins' civil rights was caused by the City's failure to properly supervise the police officers.  In Count III, brought under § 1983 but against both Defendants, Plaintiffs alleged that Mr. Wilkins' death was the result of a policy and practice of Defendants of providing inadequate training, discipline, and supervision.

Counts IV through VII arose under Maryland law.  Plaintiffs in Count IV asserted a negligent failure to train claim against the City. Count V asserted violations under the Maryland Constitution -- against both Defendants on the basis of respondeat superior and against the City "for [its] own direct violations of the Maryland Constitution."  Id. ¶ 25.  Count VI was a wrongful death claim asserted by Rachel Coe, premised on the alleged negligence of both Defendants.  And finally, Count VII was a negligence claim asserted on behalf of the estate of Wilkins.

Defendants removed the action to this Court and filed motions to dismiss.  On October 9, 2008, this Court granted those motions in part and denied them in part.  As to the claims against the City,

the Court dismissed the state law claims to the extent they were
premised on the theory that the City was vicariously liable for the
actions of the Baltimore City police officers.  The Court allowed
those state law claims to go forward, however, to the extent they
were premised on the direct conduct of the City in failing to train
or supervise the officers.  While the City asserted that it had no
authority or ability to impact the training of officers of the BPD,
the Court opined that this issue could be more appropriately
addressed on a more complete factual record.  Similarly, the Court
allowed the § 1983 claims against the City to go forward, relying
on a line of cases that left open the possibility that, on an adequate
factual record, the City could be found liable under § 1983 where
"'there was something major amiss in the [Baltimore City Police]
Department'" such that the City should have known about it and taken
steps to correct it.  Oct. 9, 2008, Mem. at 7 (quoting Wilcher v.
Curley, 519 F. Supp. 1, 4 (D. Md. 1981)).  The Court dismissed Rachel
Coe's wrongful death claim against the City for her failure to comply
with the notice provisions of the Local Government Tort Claims Act.

As to Defendant Hamm's motion, the Court dismissed the
negligence claims against him on the basis of public official
immunity.  The Court allowed the § 1983 and the state constitutional
claims to go forward, noting that the Complaint contained allegations
that Hamm's direct conduct in failing to train and supervise his

3

officers contributed to the alleged constitutional violation.

The case then entered the discovery phase, although Defendants represent that Plaintiffs propounded neither interrogatories nor requests for production of documents, nor did they take any depositions.  Plaintiffs also failed to respond to the discovery propounded by Defendants.  At the close of discovery, Defendants filed the instant motions.  Because Plaintiff failed to take any discovery in this matter, the record before the Court on these motions consists primarily of the official police report.  BPD Final Office Report, attached to Pls.' Opp'n to City's Mot. as Ex. 2 (hereinafter, Final Report).  According to that report, the following sequence of events occurred on the afternoon of April 1, 2005.

At approximately 3:30 p.m., BPD officers observed a blue GMC Yukon (the SUV) traveling at a high rate of speed on Patterson Park Avenue.  The driver of the SUV was later identified as Mr. Wilkins. The officers attempted to effect a traffic stop, but Mr. Wilkins refused to stop and drove erratically in an attempt to elude the police.  The first responding officer lost sight of the SUV and a police helicopter was called to respond.  The helicopter re-established visual contact with the SUV and directed ground units toward the vehicle.

Officer Michael Perry, driving a marked police vehicle and

following the directions provided by the helicopter unit,
encountered the SUV at the intersection of Chase and Broadway.
Officer Perry activated his emergency lights and attempted to block
the intersection but, upon discerning that the driver of the SUV was
not going to stop, moved his vehicle to provide the SUV an avenue
of escape.  Officer Perry continued to follow Mr. Wilkins as he
continued to drive at a high rate of speed.  Officer Perry states
that Mr. Wilkins disregarded several traffic control devices and,
at times, drove on the sidewalk to get around traffic, causing
pedestrians to flee for their safety.  Id. at 4.

Officer Perry followed Mr. Wilkins to the 2400 block of
Greenmount Avenue and was able to position his marked police vehicle
in front of the SUV.  At that point, the SUV was on the sidewalk
temporarily stopped after having attempted to bypass the traffic on
the street.  Officer Perry exited his vehicle, took a cover position
behind it, drew his service weapon, and ordered Mr. Wilkins to exit
the SUV.  Mr. Wilkins placed the SUV in reverse and accelerated
toward Officer Perry's vehicle, striking it on the passenger side.
Mr. Wilkins stopped momentarily, but then again accelerated in an
attempt to push Officer Perry's vehicle out of his path.

In the meantime, other officers arrived at the scene.  Officers
Augustin Rodriguez, Christopher Florio, and Jeffrey Converse exited
their vehicles and were on foot near Officer Perry's vehicle.  They

too ordered Mr. Wilkens to exit his vehicle but he did not comply. Although the complete and precise sequence of events is difficult to reconstruct, it is undisputed that Mr. Wilkens accelerated again in the direction of Officers Rodriguez and Florio.   Fearing for their safety, Officer Perry fired several shots at the rear tire of the SUV and Officer Rodriguez fired several shots at the front tire.   Mr. Wilkins continued to accelerate in the direction of Officers Florio and Rodriguez until, in fear that these officers would be injured or killed, several officers fired at Mr. Wilkens.   Id. at 5 (statement of Officer Perry); see also id. at 6 (Officer Converse stated that he shot in response to his fear that the SUV was going to strike Officer Rodriguez), 7 (Officer Rodriguez stated that he "feared for his life" as Mr. Wilkins accelerated in his direction), 8 (Officer Florio stated that Mr. Wilkens was accelerating directly towards him).

The SUV finally came to a stop when it struck a parked vehicle. Mr. Wilkens sustained multiple gunshot wounds and was pronounced dead at the scene.

The City now moves for summary judgment arguing that, because the BPD is not an agency of the City, it has no duty to train or supervise its officers.   Defendant Hamm moves for summary judgment on the ground that there is no basis to extend supervisory liability to him.   Furthermore, he argues that there is no evidence that the

6

training or supervision of the officers in question was inadequate. More fundamentally, however, Hamm argues that the undisputed evidence cannot support a finding that Mr. Wilkins suffered a violation of his constitutional rights.

## II. LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment will be granted when no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). While the evidence of the non-movant is to be believed and all justifiable inferences drawn in his or her favor, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. See Deans v. CSX Transportation, Inc., 152 F.3d 326, 330-31 (4th Cir. 1998); Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). To defeat a summary judgment motion, the party opposing the motion must present evidence of specific facts from which the finder of fact could reasonably find for him or her. Anderson, 477 U.S. at 252; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex, 477 U.S. at 327 (citations omitted).

## III. DISCUSSION

Before there can be the possibility of liability on the part of the City or Defendant Hamm, Plaintiffs must establish that Mr. Wilkins suffered a violation of his constitutional rights.  See Grayson v. Peed, 195 F.3d 692, 697 (4th Cir. 1999) ("As there are no underlying constitutional violations by any individual, there can be no municipal liability."); Temkin v. Frederick County Comm'rs, 945 F.2d 716, 724 (4th Cir. 1991) ("A claim of inadequate training under section 1983 cannot be made out against a supervisory authority absent a finding of a constitutional violation on the part of the person being supervised.").  The Court concludes that Plaintiffs cannot establish such a violation.

The constitutional right that Plaintiffs allege was violated here is Mr. Wilkins' Fourth Amendment right to be free of unreasonable seizures, a right which includes seizures accomplished by excessive force.  Waterman v. Batton, 393 F.3d. 471, 477 (4th Cir. 2005).   The test for whether the force employed to effect a seizure is excessive is one of "'objective reasonableness' under the circumstances." Graham v. Connor, 490 U.S. 386, 399 (1989).  In determining whether force was excessive, a court must weigh "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  Id. at 396 (internal quotation marks omitted).  Because "police officers are

8

often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving," id. at 397, the facts must be evaluated from the perspective of a reasonable officer on the scene, and the use of hindsight must be avoided, see id. at 396.

Courts have noted that "[t]he intrusiveness of a seizure by means of deadly force is unmatched."  Tennessee v. Garner, 471 U.S. 1, 9, (1985).  Nevertheless, a police officer may employ deadly force when the officer has "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others."  Id. at 11.  Plaintiff's argument in support of their conclusion that the responding officers' use of deadly force in this instance was a constitutional violation seriously misstates the record.  Furthermore, Plaintiff cite no legal authority in support of their arguments.

Plaintiffs' primary argument for a constitutional violation is that, because Mr. Wilkins' SUV was "boxed in" by police cars and two tires were shot out, "the use of deadly force was not essential to bring this matter to a conclusion, and that this confrontation could have been resolved without the loss of life."  Opp'n to Hamm's Mot. at 5.  The sole evidentiary support offered by Plaintiffs for their conclusion that the SUV was "boxed in" and presumably rendered harmless was a statement of Nathan Harris, an eyewitness to the events.  Id. at 4-5.  While Plaintiffs provide no citation to the

9

record as their source of Harris's account, the Court assumes they
are referencing the summary of his statement in the Final Report.
A review of the complete summary of Harris's eyewitness account,
however, leads to a very different conclusion than Plaintiffs':

> Mr. Harris was traveling north on Greenmount
> Avenue approaching 25th Street when he observed
> a blue [SUV] traveling on the sidewalk to his
> right.  Mr. Harris then noticed that the police
> were following the [SUV].  The [SUV] was boxed
> in by several police vehicles.  Officers
> approached with their weapons drawn ordering
> the driver to come out of the vehicle.  The
> driver of the vehicle ignored the officers and
> used the [SUV] in his attempts to push one of
> the police vehicles out of his path.  The driver
> of the [SUV] then attempted to strike the
> officers with the vehicle.  Mr. Harris observes
> an African American officer shoot at the tires
> of the [SUV]; however, the driver continued in
> his attempts to strike the officers.  As a
> result, the officers shot at the vehicle which
> subsequently brought the vehicle to rest.

Final Report at 12 (emphasis added).

Plaintiffs also rely in their opposition on the observation
that, in the affidavits submitted by the responding officers with
Defendant Hamm's motion, none of the officers stated that they felt
as though they were in fear for their lives.  Opp'n to Hamm Mot. at
8.  In proffering this argument, Plaintiffs ignore the fact that in
each of their affidavits the responding officers expressly
incorporate by reference their statements contained in the Final
Report.  See Hamm's Mot., Exs. 3-6 at ¶¶ 2.  As noted above, those

10

statements all explain that the responding officers fired at the driver of the SUV in response to fear for their own safety or the safety of a fellow officer or officers.

Plaintiffs mention several times that there was "no evidence that the deceased was armed.  Opp'n to Hamm Mot. at 9;  see also id. at 3, 5.  While it was later discovered that Mr. Wilkins' was not carrying a firearm, the responding officers had no way of knowing this at the time.  Officer Perry mentions that the windows of the SUV were tinted so that he could only see a silhouette of the driver. Final Report at 4.  Regardless of whether Mr. Wilkins was carrying a firearm, courts have recognized that a reasonable officer could conclude that a motor vehicle, when driven in the manner in which Mr. Wilkens drove the SUV, "had become a deadly weapon with which [the driver] was armed."  Pace v. Capobianco, 283 F.3d 1275, 1282 (11th Cir. 2002).

Finally, Plaintiffs offer the absurd argument that the Court must take into consideration the fact that "up to the time that weapons were fired, [] nobody, either civilian, responding police officers, or Mr. Wilkins, has sustained any injury."  Opp'n to Hamm Mot. at 7.  There is, of course, no requirement that police officers wait until someone is injured or killed before responding with appropriate force.  See Elliott v. Leavitt, 99 F.3d 640, 641 (4th Cir. 1996) ("The Constitution simply does not require police to

gamble with their lives in the face of a serious threat of harm.")

Plaintiffs' mischaracterizations of the record and unsupported legal conclusions aside, the undisputed record before the Court shows that Mr. Wilkins still posed a threat of serious physical harm to the responding officers at the time deadly force was used.

In reaching this conclusion, this Court is guided by the Fourth Circuit's decision in Waterman, supra.  In Waterman, a motorist led police officers on a chase up Interstate 95 and through the Fort McHenry Tunnel.  During the course of the chase, one of the pursuing officers reported that the suspect had attempted to run him off the road.  As the chase proceeded through the tunnel, police officers prepared to intercept the suspect at the toll plaza.  As the suspect approached the plaza, five uniformed officers emerged from around the concrete island with weapons drawn, approached the vehicle, and ordered the suspect to stop.  The suspect slowed as he approached the toll plaza but when the vehicle in front of him began to move, the officers observed the suspect's vehicle lurch or lunge forward in the general direction of the toll plaza and the officers ahead of him.  Although none of the officers were directly in front of the vehicle, they stood within a few feet of the projected path and the Fourth Circuit opined that the video record of the encounter "leaves no doubt that at the moment of acceleration, there were officers positioned close enough to the vehicle that Waterman could have run

12

them over in approximately one second." Id. at 475 n.6.  As soon

as the suspect began accelerating, the officers began firing their

weapons and the suspect was fatally wounded.

In reversing this Court's denial of the officers' motion for

summary judgment, the Fourth Circuit noted the factors that the

officers could have considered in deciding whether to use deadly

force.  Those factors favoring the use of deadly force included:

> (1) that Waterman, by any account, was not acting
> rationally in leading the officers on a
> more-than-10-minute chase; (2) that he was not
> stopping despite seeing the officers approaching
> ahead of him with their weapons drawn; (3) that
> he was accelerating in the general direction of
> the officers; and, most importantly, (4) that [an
> officer] had reported just minutes before that
> Waterman had attempted to run him off the road.

Id. at 477.  Factors pointing against the use of that force included

these:

> (1) that Waterman had not driven recklessly in the
> 27 seconds between the time he emerged from the
> Tunnel and the moment he accelerated in their
> general direction; (2) that there was no visible
> damage to Waterman's vehicle or the vehicles of
> the officers pursuing him; (3) that other than his
> flight, no information indicated that Waterman
> had committed any serious crime prior to
> reportedly assaulting [one of the officers] with
> his vehicle; and (4) that Waterman had not yet
> increased his speed past 15 miles per hour or
> turned his vehicle so that the officers were
> directly in his path.

Id. at 478.

Notwithstanding these conflicting factors, the Fourth Circuit

concluded, as a matter of law, that the use of deadly force was justified.  "[T]he officers [] were faced with a suspect well positioned to seriously injure or kill one or more of them with his vehicle – possibly within a fraction of a second – if they did not employ deadly force."  Id. at 480.  The court took particular note of the "split-second nature of the decision."  Id. at 478.

The conclusion that deadly force was justified is no less valid here.  The officers were aware that Mr. Wilkins had recklessly endangered the lives of pedestrians by swerving onto the sidewalk to escape the police.  Mr. Wilkins had already used his vehicle to ram a police vehicle.  Mr. Wilkins ignored multiple orders to get out of his vehicle.  Most significantly, every witness at the scene, including the civilian witness referenced by Plaintiffs, stated that it appeared that Mr. Wilkins was attempting to strike the officers with the SUV and that it was accelerating in their direction.

Because no reasonable finder of fact could conclude that Mr. Wilkens suffered a violation of his constitutional rights,[1]

---

[1] Certainly, what happened to Mr. Wilkens is tragic and his conduct that led to this outcome seems unexplainable.  Some insight into his conduct, however, is provided by statements of his family that were included in the Final Report.  His mother and sister reported that Mr. Wilkins was mental challenged subsequent to lead poisoning as a child.  He had a "fascination" with SUVs and was known to drive them despite his lack of a driver's license.  The family attributes his behavior on the afternoon of April 1, 2005, to fear.  Final Report at 14.

14

Defendants are entitled to the entry of summary judgment in their

favor.[2]


_____/s/_____
William M. Nickerson
Senior United States District Judge


DATE: September 14, 2009

_____

2 Were the Court to find a constitutional violation, Defendants would
still be entitled to summary judgment.  Plaintiff produced no
evidence to counter the City's evidence that it has no authority over
the training of BPD officers.  See Hamm Aff. ¶¶ 3-5.  Plaintiffs also
offer no evidence or plausible argument to counter the testimony of
Defendants' expert that the training provided to BPD officers on the
use of deadly force exceeds that which is required.  See Charles Key
Aff.